AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

4919 KANSAS AVENUE, NW WASHINGTON, DC

**APPLICATION AND AFFIDAVIT**
**FOR SEARCH WARRANT**

CASE NUMBER:

(Further described below)

I     TIMOTHY J. ERVIN                     being duly sworn depose and say:

I am a(n)    Special Agent with the Federal Bureau of Investigation          and have reason to believe
(Official Title)

that
said premises, known as 4919 Kansas Avenue, NW, Washington, DC is described as a three story attached townhouse, with gray siding, black shutters and a white awning. The main entrance door to townhouse is dark in color. There is also a white screen door. The numerals "4919" appear on the porch in black.

in the District of Columbia, there is now concealed a certain person or property, namely

SEE ATTACHED AFFIDAVIT AND SCHEDULE A.

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)

concerning a violation of Title 21  United States Code, Section(s) 841(a)(1) . The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.    YES ☒ NO ☐

WILLIAM J. O'MALLEY
ORGANIZED CRIME NARCOTICS         Signature of Affiant
(202)202-305-1749                 ,

Sworn to before me, and subscribed in my presence

_____           at Washington, D.C.
Date

_____           _____
Name and Title of Judicial Officer        Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF | ) |
| | ) |
| 4919 Kansas Avenue, N.W. | ) |
| Washington, D.C | ) |

**AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT**

I.  **INTRODUCTION AND EXPERIENCE**

I, Timothy J. Ervin, Special Agent (SA) with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C., (hereinafter affiant) being duly sworn, depose and state as follows:

1. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I have been an SA with the FBI since 1991. I am currently assigned to a Drug Unit. From 1996 to 2002, and beginning again in 2003, I have been working on federal narcotics investigations and have previously participated in numerous investigations which led to the arrest and conviction of narcotics distributors. Prior to 1996, I was assigned to a counter-intelligence unit in the Federal Bureau of Investigation. Since 1991, I received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white collar crimes, search warrant applications, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques

associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies.  In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques:  interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband.

   2. Based on the experience described in the paragraph above, my personal participation in this and other investigations involving illegal drug activity, and extensive conversations with other Federal Agents and police officers who are knowledgeable of drug-trafficking investigations, your affiant knows:

     (a) Individuals who traffic in illegal controlled substances maintain books, records, receipts, notes, ledgers, money orders, bank records, currency, safe deposit box keys, telephone calling cards, address books, telephone numbers, pager numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled substances. Also, these items are generally maintained in the trafficker's residence, or residences of associates, friends or relatives, in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses, or in business locations with which the trafficker is associated

and where the trafficker has ready access to these items. It is also common practice for drug traffickers to utilize safes within their premises to safeguard and facilitate the concealment of the above described items;

      (b)    Drug traffickers routinely conceal in their residence or the residences of family members, friends and associates, as well as their business locations, and/or in places used by drug traffickers to conduct their drug distribution activity (such as automobiles, stash houses or safe houses) large quantities of currency, financial instruments, precious metals, jewelry and other items of value, which are typically the proceeds of illegal controlled substance transactions;

      (c)    It is also common for drug traffickers to secrete contraband related to their drug trafficking activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, strainers, microwave ovens, pots, dishes and other containers for preparing heroin, cocaine and other controlled substances for distribution, at their residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses. In order to avoid detection in their trafficking activities and to protect themselves from criminal charges if the stash house or safe house were discovered by law enforcement, such stash hoses or safe houses are often maintained by traffickers in the names of third parties and such third parties may or may not reside in the stash house or safe house;

      (d)    Drug traffickers commonly maintain telephone number and address books, or papers which reflect names, addresses and/or telephone numbers for other associates of their illegal organization. These individuals often utilize telephones, cellular telephones and pagers to

maintain contact with other associates of their illegal businesses, and these telephone records, bills and pager numbers are often found in their places of residence, or the residences of family members, friends or associates, in their business locations, or in places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

(e) Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

(f) Drug traffickers often own, possess and use weapons to facilitate their illegal drug trafficking activities. These weapons are most often secreted in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses; and

(g) Drug traffickers often use safe deposit boxes to amass, retain and conceal their illegal proceeds to avoid detection. Deposits to bank accounts create an accessible record (or paper trail) of deposits, withdrawal and transfer of funds and banks are required to report cash transactions in excess of $10,000 to the Internal Revenue Service (IRS). Safe deposit boxes, which are readily accessible to drug traffickers, provide a "safe haven" for illegal drug proceeds where there is no such accounting.

    (h)  Drug traffickers often use coded language and terms to disguise conversations about their drug activities. Drug traffickers also frequently use electronic paging devices commonly known as "pagers" to communicate with co-conspirators. A common technique among drug traffickers is to transmit pre-arranged numerical codes to the pager to communicate information, such as price or quantity of drugs, to the individual in possession of the pager.

    (i)  Computer hardware, software, documentation, passwords, data security devices, and data may be integral tools of narcotics trafficking and money laundering and may constitute the means of committing these and other crimes. Traffickers often keep computers and computer related equipment in their home and utilize the equipment to keep detailed records of their narcotics transactions. Various computer software programs originally designed for balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking. In addition, because information can be easily hidden in a computer in a manner that would prevent immediate identification (for example, coded file names or encryption) and because computer storage devices can be used to store the equivalent of thousands of pages of information (which could take weeks or months to sort), it is often necessary to seize an entire computer system so that a qualified computer expert can accurately retrieve the system's data in a controlled laboratory setting.

  3.  This affidavit is based in part on physical surveillance, and in part on the controlled purchases of narcotics. This affidavit does not contain all of the information known to me regarding this investigation. Your affiant has included in this affidavit facts which he believes are sufficient to support a probable cause finding for the issuance of the requested search warrant.

4. As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other Special Agents of the FBI, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show there is probable cause to believe the fruits, evidence, and instrumentalities of violations of the following federal offense, among others, are presently to be found at 4919 Kansas Avenue, N.W., Washington, D.C.: Possession with intent to distribute and Distribution of controlled substances, in violation of Title 21, United States Code § 841(a)(1).

**II.     PROPERTY TO BE SEIZED**

1. Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular heroin, or other controlled substances.

2. Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers.

3. Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money.

4. United States currency, precious metals, jewelry and financial instruments, stocks and bonds.

5. Photographs, in particular photographs of co-conspirators, assets and/or controlled substances.

6. Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition.

7. Cellular telephones, pagers and records and receipts reflecting their ownership and use.

8. Safes, both combination and key type, and their contents.

9. Indicia of occupancy, residence and/or ownership of the premises described herein, including, but not limited to utility and telephone bills, canceled envelopes and keys.

10. Any and all electronic data processing and storage devices, computers and computer systems, keyboards, Central Processing Units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.

### III. DESCRIPTION OF PREMISES

5. This affidavit is respectfully submitted in support of an application for a warrant to search and seize evidence from the property commonly known as 4919 Kansas Avenue, N.W. Washington, D.C. The property is further described as a three story attached townhouse, with gray siding, black shutters and a white awning. The main entrance door to the townhouse is dark in color. There is also a white screen door. The numerals "4919" appear on the porch in black.

### IV. THE INVESTIGATION

6. This investigation was initiated by the FBI in October of 2007, based upon information received from a reliable and confidential source (hereinafter referred to as "CW-1"), who has provided truthful information on numerous occasions about significant drug traffickers and

has never provided any false information. During October, CW-1 had been assisting the FBI by making controlled purchases of cocaine base from an individual in Washington, D.C. On October 25, 2007, that individual introduced CW-1 to a man nicknamed "PANAMA," who was described as another cocaine base supplier.

7.  On October 25, 2007, following the introduction, CW-1 made a controlled purchase of cocaine base from PANAMA for $1,200 on 3rd Street, N.W., near the intersection with Kennedy Street. PANAMA also provided CW-1 with his cellular telephone number. The transaction was recorded, as it took place inside an FBI undercover vehicle equipped with interior audio and video recording  It was also recorded on video by FBI agents on surveillance near the transaction. After the transaction, PANAMA was followed to 4919 Kansas Ave, N.W. He was observed entering and later exiting that residence. The material purchased by CW-1 was submitted to the DEA laboratory for analysis, and was determined to be cocaine base with a weight of 30.4 grams and a purity of 44%.  8.  On November 2, 2007, CW-1 placed a recorded telephone call to PANAMA in which they agreed to meet for a narcotics transaction. They later met near the intersection of 7th Street and Kansas Avenue, N.W., where CW-1 made a controlled purchase of cocaine base from PANAMA for $2,400. The transaction was recorded, as it took place inside an FBI undercover vehicle equipped with interior audio and video recording  It was also recorded on video by FBI agents on surveillance near the transaction. After the transaction, PANAMA was followed to 4919 Kansas Ave, N.W., and was observed entering the residence. The material purchased by CW-1 was submitted to the DEA laboratory for analysis, and was determined to be cocaine base with a weight of 58.5 grams and a purity of 40%.

9.   On December 3, 2007, CW-1 placed a recorded telephone call to PANAMA in which they agreed to meet for a narcotics transaction. They later met near the intersection of Eastern Avenue and New Hampshire Avenue, N.E., Washington, D.C., then drove together to the intersection of Kansas Avenue and Farragut Street, N.W. At that location, PANAMA exited the undercover vehicle and was observed walking down the alley behind 4919 Kansas Avenue. A few moments later, PANAMA was observed exiting the front door of 4919 Kansas Avenue. He then re-entered the undercover vehicle and sold CW-1 cocaine base for $1,200. Just after the transaction was completed, FBI agents utilized a pretext in order to approach the undercover vehicle and identify PANAMA. He provided a fraudulent District of Columbia driver's license in the name of TONY LEE, date of birth 7/28/72, 4253 Gault Pl, N.E., Washington, D.C. The transaction was recorded, as it took place inside an FBI undercover vehicle equipped with interior audio and video recording. The material purchased by CW-1 was submitted to the DEA laboratory for analysis, and was determined to be cocaine base with a weight of 27.7 grams and a purity of 55%.

10.   On January 22, 2008, CW-1 received a telephone call from PANAMA. This call was not recorded. During the call, PANAMA told CW-1 that he was "ready for the party," which CW-1 interpreted to mean that PANAMA was ready to once again sell cocaine base to CW-1.

11.   As demonstrated through the FBI investigation, there is probable cause to establish that a person who has not yet been fully identified, also known as PANAMA, also known as TONY LEE, is a distributor of cocaine base, and utilizes 4919 Kansas Avenue, N.W., Washington, D.C., in order to facilitate the distribution of cocaine base.

## VI.   **CONCLUSION**

12.   Your affiant asserts that the facts contained within this affidavit establish probable cause to believe that the fruit, evidence and instrumentalities of violations of the laws of the United States, specifically 21 U.S.C. §§ 841(a)(1), are presently to be found in the above-listed premises, including items listed in Schedule A attached to this affidavit and incorporated herein.  Therefore, in light of the circumstances and the evidence adduced from this investigation, your affiant respectfully submits that probable cause exists for the issuance of a search warrant for the location/address listed above.

                                                                                        _____
                                                                                        TIMOTHY J. ERVIN, Special Agent
                                                                                        Federal Bureau of Investigation

SWORN AND SUBSCRIBED to before me this 1st day of February, 2008

                                                                                        _____
                                                                                        ALAN KAY
                                                                                        United States Magistrate Judge

**SCHEDULE A**

1. Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular heroin, or other controlled substances.

2. Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers.

3. Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money.

4. United States currency, precious metals, jewelry and financial instruments, stocks and bonds.

5. Photographs, in particular photographs of co-conspirators, assets and/or controlled substances.

6. Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition.

7. Cellular telephones, pagers and records and receipts reflecting their ownership and use.

8. Safes, both combination and key type, and their contents.

9. Indicia of occupancy, residence and/or ownership of the premises described herein, including, but not limited to utility and telephone bills, canceled envelopes and keys.

10. Any and all electronic data processing and storage devices, computers and computer systems, keyboards, Central Processing Units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.